NOTICE

Decision filed 06/22/20. The text of this decision may be changed or corrected prior to the filing of a Peti ion for Rehearing or the disposition of the same.

2020 IL App (5th) 170076-U

NO. 5-17-0076

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Williamson County. |
| | ) | |
| v. | ) | No. 15-CF-260 |
| | ) | |
| EDWARD T. URBAN, | ) | Honorable |
| | ) | Brian D. Lewis, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE OVERSTREET delivered the judgment of the court.
Presiding Justice Welch and Justice Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*: The defendant's conviction for predatory criminal sexual assault of a child is affirmed where the State proved his guilt beyond a reasonable doubt, the trial court did not err in denying his motion to suppress statements, and his claim of prosecutorial misconduct was without merit.

¶ 2    On appeal from his conviction for predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2014)), the defendant, Edward T. Urban, argues that the State failed to prove his guilt beyond a reasonable doubt, that the trial court erred in denying his motion to suppress statements, and that prosecutorial misconduct with respect to the State's questioning of the child victim denied him a fair trial. For the reasons that follow, we affirm.

1

¶ 3                                    BACKGROUND

¶ 4     On April 22, 2015, Kristina Vick of the Illinois Department of Children and Family Services commenced an investigation into allegations that the defendant had been sexually abusing his second cousins, M.A. and Z.M. M.A. was seven years old at the time, and Z.M., his younger sister, was five. The defendant was 27 and lived with his mother in rural Freeman Spur. The investigation revealed that the defendant and his mother babysat M.A. and Z.M. "almost every weekend" and that the defendant and M.A. had a "pretty close" relationship. The investigation further revealed that M.A. had been suffering from urinary and bowel incontinence for several years.

¶ 5     The record indicates that during the course of Vick's investigation, M.A. and Z.M. were separately interviewed by a child advocate at the Franklin-Williamson County Child Advocacy Center in Herrin. We note that video recordings of the children's interviews were included in the State's answer to the defendant's request for discovery but were not later introduced at the defendant's bench trial. We further note that the abuse investigation ultimately focused on specific incidents that purportedly occurred at the defendant's home sometime after January 1, 2015.

¶ 6     On April 23, 2015, Detective Randy Pritchard of the Williamson County Sheriff's Department was assigned to investigate the abuse allegations as a criminal matter, and he and Vick agreed to work together. Pritchard later explained that when M.A. reported the abuse, the boy had used the word "worm" as "meaning penis" and had indicated that the defendant had placed his "worm" in M.A.'s hand and on M.A.'s anus. Pritchard further explained that Z.M. had reported that the defendant had "licked her butt" and her "coo coo" and had "placed his finger in what she called her little hole in her butt."

¶ 7    On the morning of April 24, 2015, Vick and Pritchard drove to the defendant's home and advised him that they were investigating allegations of sexual abuse. Although they did not indicate who the allegations involved, the defendant asked, "What did [M.A.] say?," and then explained that the children's mother had been "wanting to stir [up] problems in the family." When Vick and Pritchard asked the defendant if they could come inside and speak with him, the defendant and his mother denied their request to enter, and the defendant twice asked them to leave. Ultimately, however, the defendant agreed to be interviewed at the Williamson County Sheriff's Department. Pritchard later testified that although the defendant was initially reluctant to cooperate, he had agreed to do so after he was advised that he was not under arrest, that he could return home after the interview was over, and that whether he was interviewed or not, the investigation "wasn't going away." Pritchard testified that he had the defendant drive himself to the sheriff's department so that Pritchard "wouldn't need to bring him back to his house afterwards."

¶ 8    The defendant subsequently drove himself to the sheriff's department, and upon his arrival, Pritchard escorted him to an interview room, where the defendant seated himself at the room's table in the position farthest away from the door. After the defendant sat alone for approximately 10 minutes, Vick, Pritchard, and Detective Scott McCabe of the Williamson County Sheriff's Department entered the room and sat in the three other chairs around the table. We note that before sitting down, Vick moved her chair several feet away from the table, thus giving the defendant an unobstructed path to the door.

¶ 9    At the outset, the defendant was advised that the interview would be video recorded. When Pritchard confirmed that the defendant had voluntarily come in to be interviewed, the defendant agreed that he had come in to "get [the matter] straightened up." When asked why the

defendant believed that the abuse allegations involved M.A., the defendant explained that while he was potty-training M.A. when the child was two, there were rumors that the defendant had inappropriately touched him. The defendant further explained that he and M.A.'s mother had discussed the matter and that he had assured her that he was only showing M.A. how to use the toilet. The defendant surmised that M.A.'s mother was presently trying to "stir things up" to distract the authorities from her own issues involving M.A. and Z.M. The defendant also advised that he had recently stated that he did not want to see M.A. or Z.M. for a while, so as to avoid any potential problems.

¶ 10 When Pritchard advised the defendant that they were investigating allegations of recent abuse, the defendant acknowledged that he and M.A. had occasionally played alone in a treehouse behind the defendant's house. He explained, however, that they generally played inside the defendant's home. The defendant stated that M.A. had never been naked in the treehouse and that he only saw M.A. naked when he bathed and dressed the boy. The defendant explained that M.A. frequently "peed" himself and that the accidents had been an ongoing problem since the child was two. The defendant denied that M.A. also "crapped his pants" a lot, indicating that M.A. had not had that problem for several years.

¶ 11 When asked if he ever bathed or showered with M.A., the defendant initially stated that he had not done so since M.A. was two. The defendant subsequently explained, however, that he had recently bathed or showered with M.A. when M.A. was really dirty and needed scrubbed. The defendant indicated that he had last showered with M.A. in February 2015.

¶ 12 The defendant acknowledged getting erections when bathing or showering with M.A. The defendant initially indicated that his penis had never come into direct contact with M.A.'s buttocks area because they maintained an arm's-length distance when washing. The defendant

4

further indicated that whenever the boy got curious about the defendant's erection and "grabbed" it, the defendant would shoo him away. The defendant explained that any potential contact between his penis and M.A. would have been "pretty much innocent."

¶ 13    After advising the defendant that M.A. was going to be examined by a physician, Pritchard admonished the defendant that if his erection ever accidently entered M.A.'s "butt," it would be best for the defendant to be truthful and acknowledge it. The defendant agreed that he wanted the matter "all cleaned up" and insisted that he was telling the truth. Pritchard reminded the defendant that he was not under arrest and explained that unless the defendant stated that he "killed somebody," he would be "going home today" no matter what he told the investigators. Pritchard advised the defendant that it seemed like the defendant wanted to tell the truth but was not doing so. The defendant explained that he had agreed to be interviewed so that he could tell the truth, stating that he was "telling it like it is."

¶ 14    The defendant was subsequently informed that M.A. had been interviewed and had made "some statements." Pritchard then asked the defendant if his penis had ever entered M.A.'s "butt" or mouth or if he had ever ejaculated on M.A. The defendant insisted that such conduct had never occurred. The defendant explained that he and M.A. had been "buddies" since the child's birth and that he never hurt M.A. Explaining that M.A. always wanted to see him, the defendant suggested that such would not be the case if he had hurt the boy. The defendant explained that he had recently made the same point to M.A.'s mother.

¶ 15    McCabe and Pritchard subsequently asked the defendant why M.A. would "make this up" given that the two were "so close." McCabe further advised the defendant that if the things M.A. had described had happened, M.A. would need counseling. In response, the defendant referenced something that might have happened when the boy was two. When Pritchard suggested that

5

M.A. would not have remembered that incident and that M.A. had disclosed that something had recently happened, the defendant asked what M.A. had reported. Pritchard advised that one reported incident involved the defendant ejaculating on M.A. while they were in the shower. The defendant denied that such an event had ever occurred, but he acknowledged that he and M.A. both urinated in the shower. He further acknowledged that his close bond with M.A. included physical attraction. The defendant again explained that he and M.A. had been buddies since the boy was two. The defendant admitted that he hugged M.A. more than he should. McCabe then suggested that the defendant's physical attraction to M.A. might have led to "something" recently happening in the shower, and he encouraged the defendant to tell the truth about what had occurred.

¶ 16    The defendant subsequently explained that the last time he and M.A. had showered together, they sat down facing each other, and he had lifted the boy's feet up to wash them while the boy's buttocks were positioned on the defendant's knees. The defendant indicated that he had then washed the boy's legs and back, and that was "about it." McCabe advised the defendant that he did not believe that the defendant was disclosing everything that had happened and again reminded the defendant that unless the defendant stated that he "killed somebody," he was "walking out of here." McCabe further advised the defendant that the defendant would feel better if he told the truth. When McCabe asked the defendant if he wanted to hear McCabe's opinion, the defendant indicated that he did. McCabe then stated that he believed that the defendant loved M.A. too much and that the defendant's feelings had resulted in something sexual happening in the shower. McCabe encouraged the defendant to disclose everything that had happened.

¶ 17    The defendant subsequently reiterated that he and M.A. had been buddies since the boy was two and that he had "feelings for him." The defendant indicated that he tried to keep his

6

distance from M.A., but a few "risqué" incidents might have occurred over the years. The defendant insisted, however, that he had never "sexually hurt [his] buddy." McCabe encouraged the defendant to elaborate and again advised him that no matter what he disclosed, he was "walking out." When the defendant indicated that he sometimes "pet on" M.A.'s buttocks while they lay in bed, McCabe urged the defendant to discuss what else had happened in the shower. When McCabe asked, "At any time, did your penis ...?," the defendant quickly cut him off and insisted that he had "never forced" himself "into" M.A. The defendant indicated that he did not wish to further discuss whether he had ever "put [himself] into" M.A., stating that he had never hurt the boy.

¶ 18    McCabe subsequently advised the defendant that young children do not generally fabricate stories of a sexual nature due to their lack of sexual knowledge. McCabe suggested that M.A. had either seen or experienced what he had reported. In response, the defendant indicated that M.A. had been sitting on the defendant's abdomen while the defendant washed the boy in the shower. The defendant agreed that it was possible that M.A. might have slid down onto the defendant's erection at some point. The defendant further agreed that it was also possible that his erection had slid into M.A.'s buttocks area. The defendant indicated that he did not see it as a "big deal" and that M.A. had not slid down hard.

¶ 19    Thereafter, the defendant again described what had recently occurred in the shower. Using his hands to demonstrate how he had positioned and washed M.A., the defendant's account suggested that the shaft of the defendant's erect penis could have come in direct contact with M.A.'s anus as the boy's legs and feet were being scrubbed. When Pritchard suggested that the defendant's penis might have entered M.A.'s "butt" and asked "how far it [had gone] in," the defendant suggested that when M.A. "slipped," the defendant's penis might have grazed "him"

7

either "in the center or on the sides." He insisted, however, that while his penis was in between M.A.'s "butt cheeks," it had never gone "in" the boy's "butt." The defendant again indicated that he did not wish to further discuss whether an act of anal penetration might have occurred. When the detectives intimated that M.A. had reported that such an act had occurred and that they believed him, the defendant stated, "I never put myself in that boy." When the detectives indicated that they did not believe the defendant and again encouraged him to be truthful, the defendant insisted that he had been telling them the truth and then accused them of wanting him to confess to doing something that he had not done. In response, McCabe accused the defendant of "holding stuff back" and noted that the defendant's account of what had occurred in the shower kept changing.

¶ 20    The defendant subsequently explained that he had been the closest thing to a father that M.A. had ever had. The detectives assured the defendant that no one was doubting that he cared about the boy and then advised him that if his penis had entered M.A.'s anus while it was in between the boy's "butt cheeks," the detectives would find out. The defendant again insisted that he "never put [himself] in [M.A.]" and that his penis "never went in him." Using his hands to ostensibly demonstrate where his erection had been with respect to M.A.'s anus, the defendant again acknowledged, however, that his penis might have "grazed" the boy. When McCabe asked if the defendant might have ejaculated while his penis was "rubbing around on the outside of [M.A.'s] butt," the defendant denied having done so.

¶ 21    When the detectives again encouraged the defendant to tell the truth, the defendant became agitated and accused the detectives of wanting him to tell them something that they "wanted to hear." The detectives again advised the defendant that M.A. had given statements that the detectives believed were true. The defendant insisted that he would never hurt his "buddy"

8

and that he "never put [himself] in that boy." The defendant explained that when M.A. was four, he had put a suppository in M.A.'s anus when M.A. was sick.

¶ 22    When Pritchard again asked the defendant what had occurred in the shower, the defendant again accused the detectives of "wanting [him] to confess to something that [he] didn't do." When the detectives advised him that they would prove what had happened, the defendant suggested that if he had forced himself "in" M.A., there would be physical evidence, and the boy would have been physically hurt and traumatized. The defendant again insisted that he had never "put [himself] in [M.A.]" and had never "put [himself] in there." The defendant stated that he was not going to confess to something he had not done and that the detectives were not interested in hearing the truth.

¶ 23    When McCabe asked the defendant if he had ever heard that sexually abused children are often prone to incontinence, the defendant stated that he had never heard that and then explained that M.A. had been having such problems since he was two. When McCabe observed that the defendant had known M.A. since the boy was two, the defendant insisted that he knew where "the line" was. Using his thumb and forefinger to ostensibly demonstrate the size of M.A.'s anus, the defendant stated that would never put himself "in" M.A. because doing so would hurt "a little guy like that." The defendant again posited that if he had forced himself into M.A., the boy would not want to come to his house and see him. The defendant accused the detectives of implying that he had done something that he had not done.

¶ 24    Pritchard subsequently removed a set of DVDs from an envelope and advised the defendant that the discs contained interviews with M.A. Pritchard advised that he had watched the interviews and did not believe that M.A. was lying. At that point, the defendant became emotional and insisted that he would never "do that" to his "buddy" and would never hurt his

9

"boy." The defendant suggested that if M.A. had indicated that the defendant had put himself "inside" of M.A., the accusations were not true. The defendant reiterated that he had previously put a suppository in the child's anus and that "was about it."

¶ 25    After Pritchard repeatedly suggested that M.A. was not lying, the defendant became agitated and demanded to know if M.A. had ever stated that the defendant's penis had been "inside of him." After a brief pause, Pritchard again suggested that the defendant tell the truth. The defendant again denied having ever "put [himself] into [M.A.]" and stated, "This is ridiculous." Noting that it was obvious that the detectives did not believe him, the defendant then asked, "What's the next step?" In response, McCabe reminded the defendant that he was not under arrest and was thus free to leave at any time. The defendant acknowledged that he could leave but observed that "this [was not] going away." McCabe then advised the defendant that they wanted the truth. McCabe also asked the defendant if sexual offenders should be imprisoned or treated with counseling. At that point, the defendant explained that he had personal issues that required him to take antidepressants. McCabe suggested that the defendant might also benefit from sex offender treatment. Pritchard suggested that the defendant could assist himself moving forward if he were truthful, stating, "The ball's in your court now." Pritchard indicated that if the defendant did not wish to cooperate further, then the investigation into M.A.'s allegations would proceed.

¶ 26    After a relatively long pause, Pritchard again encouraged the defendant to tell the truth and suggested that the defendant wanted to tell the truth. The defendant indicated that he had said all that he had to say and that he had "never forced [himself] in M.A." When he was asked to again recount what he had done, the defendant again described how he had scrubbed M.A. while M.A. was sitting on his abdomen. Using his hands to demonstrate how he had positioned

and washed the boy, the defendant again indicated that the shaft of his erect penis could have come in direct contact with M.A.'s anus as the boy's legs and feet were being scrubbed. The defendant again insisted, however, that he "never put [himself] in [M.A.]" When Pritchard advised that the defendant's account did not entirely match up with what M.A. had reported, the defendant stated that he "never hurt [his] boy." The defendant indicated that he was "sticking to" that and that the detectives could continue their investigation as they saw fit.

¶ 27    When McCabe subsequently asked the defendant if he knew M.A.'s five-year-old sister, Z.M., the defendant acknowledged that he did. The defendant further acknowledged that he sometimes showered with Z.M., but he indicated that he had not done so in the past year. After a brief pause, the defendant suggested that they just "go forward" because the detectives were going to continue to try to get him to confess to things that he had not done. When McCabe again advised the defendant that he could leave at any time, the defendant again indicated that his departure would not resolve the matter. The detectives then reiterated that they did not believe that the defendant was telling them the truth. The detectives further opined that the defendant was demonstrating a lack of remorse. At that point, the defendant indicated that he wanted his attorney, and the interview ceased. When exiting the room, the defendant loudly and angrily suggested that Pritchard had been trying to get him to falsely confess.

¶ 28    On May 29, 2015, a warrant for the defendant's arrest was issued after the State filed an information charging him with five counts of predatory criminal sexual assault of a child. Count I alleged that the defendant placed his penis on M.A.'s anus, count II alleged that the defendant placed his penis in M.A.'s hands, count III alleged that the defendant placed his hands on M.A.'s penis, count IV alleged that the defendant placed his finger in Z.M.'s anus, and count V alleged

11

that the defendant placed his tongue in Z.M.'s sex organ. All of the acts were alleged to have occurred between January 1, 2015, and April 24, 2015.

¶ 29 On June 1, 2015, the defendant was taken into custody. On August 26, 2015, the defendant filed a motion to suppress statements, arguing that he had been in custody for *Miranda* purposes during his April 24, 2015, interview but had not been advised of his *Miranda* rights. At the January 22, 2016, hearing on the motion, Pritchard and Vick provided consistent accounts of their visit to the defendant's home, and when Pritchard testified, a DVD copy of the defendant's video-recorded interview was admitted into evidence. Pritchard, Vick, and McCabe testified that the defendant had voluntarily participated in the interview and that the video recording completely and accurately depicted what had occurred. McCabe acknowledged that Pritchard had "asked the majority of the questions," and Pritchard acknowledged that he had attempted to elicit incriminating statements from the defendant. Pritchard and Vick both acknowledged that the defendant was somewhat "awkward." The defendant testified that he earned average grades in high school, that he did not have "a social life outside [his] house," and that in March 2015, he quit the job that he had held for 6½ years because the company he worked for "didn't give a crap about their employees."

¶ 30 On February 10, 2016, concluding that the defendant's interview had not occurred in "a custodial situation," the trial court entered an order denying the defendant's motion to suppress statements. The court noted that the defendant had voluntarily appeared at the sheriff's department and was repeatedly advised that "unless he confessed to murder, he was going home when they were done." The court further noted that the defendant was also advised that he was not under arrest and could leave at any time.

12

¶ 31    On October 25, 2016, the cause proceeded to a bench trial, where a DVD of the defendant's video-recorded interview was again admitted into evidence through Pritchard's testimony. Pritchard again testified that the video recording completely and accurately depicted what had occurred.

¶ 32    Vick testified that when she first met M.A., he urinated in his pants when she began to interview him. She further testified that she had been trained that a child's otherwise unexplained incontinence was a sign of possible sexual abuse. Vick indicated that M.A. and Z.M. both had difficulties "sitting still" when interviewed.

¶ 33    Z.M. subsequently testified but exhibited difficulties answering questions and focusing her thoughts. She apparently refused to answer any questions about the defendant until she was provided with a toy that she requested, and she repeatedly referenced a cake that the defendant's mother had made for M.A. When asked if she could tell the judge the truth about what she and the prosecutor had previously discussed, Z.M. stated that the defendant had "licked" her. When asked if she could point to where the defendant had licked her, Z.M. apparently pointed downward and stated, "The one I sit on." Z.M. denied that anything else had happened, but she indicated that she and the defendant had "[p]layed outside in the snow."

¶ 34    When cross-examined, Z.M. recited the alphabet and counted to 12. She also testified that she used to enjoy going to the defendant's house. Z.M. acknowledged that she had spoken with the prosecutor shortly before taking the stand. Z.M. indicated that the prosecutor had told her that if she was good in court, she would get candy.

¶ 35    M.A. was subsequently allowed to testify with the assistance of a facility dog (see 725 ILCS 5/106B-10 (West 2016)), but like Z.M., he also exhibited difficulties. The record indicates that M.A. responded to numerous questions with gestures, whispered several responses to the

13

prosecutor and the judge, and had problems staying seated. The State reminded M.A. that he had promised to tell "the truth," and the court admonished him that he had to "use words."

¶ 36 M.A. explained that he and the defendant had always had fun playing together, but "some bad things" had happened. Indicating that the defendant had sometimes touched him in ways he did not like, M.A. stated, "Sometimes [the defendant] didn't do that." When asked if he could tell the judge about some of the bad things the defendant had done, M.A. indicated that the defendant had "[t]ouched one part" with "the thing." When specifically asked what the defendant had done, M.A. replied, "You know, like this, like this." When asked what the "thing" was, M.A. replied, "I don't know." When M.A. was further questioned about it, the State posed questions such as, "Is it a part of your body?," and, "What do you do with it?" After the State asked M.A. if he could tell the judge what the "thing" was used for on a daily basis, M.A. whispered to the judge, "Go pooh-pooh." M.A. then stated, "It's a secret." When asked what the defendant had used to touch M.A.'s "thing," M.A. described a laxative suppository. When asked what part of the defendant's body the defendant had used and if M.A. had one, M.A. asked, "On my butt?," and then stated, "Let me think about it." The State then asked M.A., "What makes you a boy?," and in response, M.A. whispered "worm" to the judge and again stated, "It's a secret." When asked what his "worm" was used for on a daily basis, M.A. whispered, "Pee," to the judge. When the prosecutor specially asked if the defendant had used his "worm" to touch M.A.'s "butt," the record indicates that the boy got upset, gestured, shook his head, and stated, "Don't say that." The record further indicates that M.A. subsequently crawled underneath a nearby desk. When asked if he had anything more to tell, M.A. stated, "That's all of it," and then indicated that he missed the defendant and still liked him.

14

¶ 37    When cross-examined, M.A. testified that he was nine years old but did not know the year in which he was born. He further testified that he did not know how to read. M.A. indicated that he missed going to the defendant's house and missed the defendant "a lot." M.A. indicated that his "real dad" used to whip him with a belt and was presently in jail. M.A. acknowledged that he had told his grandmother that "nothing happened between [him] and [the defendant]." He then indicated that the defendant had inappropriately touched him two times on one occasion and that it "[h]appened in the snow."

¶ 38    On redirect, M.A. indicated that he was not lying about what had occurred but did not want the defendant to get into trouble. He also explained that the defendant had inappropriately touched him while they were in the bathroom after having played outside in the snow. M.A. denied that anyone had told him to not tell what the defendant had done. When further cross-examined, M.A. indicated that the incident in the bathroom had occurred in the shower and that he did not want to answer any more questions. When M.A. was excused as a witness, he asked the judge if the judge could let the defendant out of jail "[m]aybe tomorrow."

¶ 39    At the close of the State's case, the defendant moved for a directed finding that the State had failed to prove any of its charges beyond a reasonable doubt. The defendant argued that the children's testimony was uncertain, unreliable, and uncorroborated. The State countered that it had proven the specific allegations set forth in counts I and V. In response, the defendant maintained that Z.M.'s testimony that he had licked her "where she sits" was insufficient to sustain a conviction on count V and that M.A.'s testimony was insufficient to sustain a conviction on count I. Following a recess during which the trial court reviewed the recording of the defendant's interview, the court granted the defendant's motion for a directed finding with

15

respect to counts III, IV, and V. Thereafter, the defendant presented the following evidence in defense of counts I and II.

¶ 40    The defendant's mother, Barbelle Urban, testified that she and the defendant lived together in Freeman Spur and frequently babysat M.A. and Z.M. during the winter and spring of 2015. Barbelle stated that the defendant and the children often engaged in outdoor activities and that the defendant would bathe the children whenever they got "cruddy." She explained, however, that her home had a shower with no bathtub and that from mid-January 2015 until early April 2015, the home's hot water heater was inoperable. As a result, the children bathed in a large tote with water warmed from the stove. Barbelle testified that M.A. had never complained about anything with respect to the defendant, that M.A. loved the defendant, and that M.A. and the defendant were buddies.

¶ 41    Mildred Taylor testified that Barbelle was her daughter, the defendant was her grandson, and M.A. was her great-grandson. Mildred indicated that Barbelle and the children frequently visited her on the weekends. Mildred testified that after the defendant was arrested, M.A. talked about the situation every time he visited. Mildred stated that M.A. had "always said to call the police" so that the defendant could get out of jail. Mildred testified that M.A. had told her that he had lied about the defendant hurting him and that it was M.A.'s fault that the defendant was incarcerated. Mildred further testified that M.A. had indicated that the police had tricked him into implicating the defendant.

¶ 42    During closing arguments, the State maintained that it was apparent that when M.A. testified, he wanted to tell the truth but did not want to say anything that would prolong the defendant's incarceration. The State contended that it was further apparent that it had been very difficult for M.A. to disclose what he and the defendant had kept secret.

16

¶ 43    The defendant argued that at most, M.A. had testified that the defendant had "touched [M.A.] where [M.A.] poop[ed] with what [the defendant] pee[d] with." The defendant suggested that M.A.'s testimony was uncorroborated and should be viewed with suspicion given the boy's age and statements to Mildred. The defendant further suggested that M.A.'s claim that the touching had occurred in the shower was inconsistent with Barbelle's testimony that the house had no running hot water when the incident allegedly occurred.

¶ 44    In rebuttal, the State argued that coupled with the defendant's admissions, M.A.'s testimony indicating that the defendant had used his "worm" to touch M.A. "where he poops" was sufficient to sustain a conviction on count I. The State further suggested that M.A.'s testimony was believable given that he had clearly not wanted to disclose what had happened.

¶ 45    Following a recess, the trial court found the defendant guilty on count I and not guilty on count II. As to count I, the court noted that as alleged in the State's information, the State had not been required to prove that an act of actual penetration had occurred. The court further noted that when interviewed, the defendant had indicated that when M.A. slid down on the defendant's erect penis, the defendant's penis "might have gone in his buttocks area, [and] just grazed him." The court found that there was undoubtedly "arousal and/or gratification involved" and that "[t]here was corroborating evidence provided by [M.A.'s] testimony."

¶ 46    On January 17, 2017, the trial court imposed a 10-year sentence on the defendant's conviction with a 599-day credit for time served in the Williamson County jail. On February 10, 2017, the defendant filed a timely notice of appeal.

¶ 47                                    DISCUSSION

¶ 48    As previously indicated, on appeal, the defendant argues that the State failed to prove his guilt beyond a reasonable doubt, that the trial court erred in denying his motion to suppress

17

statements, and that he was denied a fair trial due to prosecutorial misconduct with respect to the State's questioning of M.A. Having thoroughly reviewed the record, we reject all of these claims.

¶ 49                                    Reasonable Doubt

¶ 50    "The due process clause of the fourteenth amendment to the United States Constitution safeguards an accused from conviction in state court except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime charged." *People v. Brown*, 2013 IL 114196, ¶ 48. When a defendant challenges the sufficiency of the State's evidence on appeal, a reviewing court must view the evidence in the light most favorable to the State and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* "Under this standard, a reviewing court must allow all reasonable inferences from the record in favor of the prosecution" (*People v. Davison*, 233 Ill. 2d 30, 43 (2009)), and a defendant's conviction will only be reversed where the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of the defendant's guilt (*People v. Campbell*, 146 Ill. 2d 363, 375 (1992)). "The standard gives 'full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' " *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The standard applies equally to both bench trials and jury trials. *People v. Howery*, 178 Ill. 2d 1, 38 (1997).

¶ 51    Here, as charged in the State's information, to prove the defendant's guilt on count I, the State was required to prove that the defendant was 17 years of age or older, that M.A. was under the age of 13, and that the defendant "placed his penis on the anus of M.A." for the purpose of sexual gratification or arousal. See 720 ILCS 5/11-1.40(a)(1) (West 2014). On appeal, the defendant acknowledges that the State was only required to prove "slight" contact between his

18

penis and M.A.'s anus. *Id*. The defendant argues, however, that the State failed to prove that any such contact occurred. The defendant maintains that at most, the State's evidence supported a finding that his penis either "grazed" M.A.'s buttocks or merely went in between the boy's buttocks. We disagree and conclude that the trial court rightfully recognized that in context, the defendant's descriptions and admissions regarding the incident in the shower indicated that his erection had made contact with M.A.'s anus but had not actually gone "inside" the boy. We further note that although portions of M.A.'s testimony were confusing and could be viewed as conflicting or contradictory, the testimony was sufficient to corroborate that contact between the defendant's penis and M.A.'s anus had occurred. See *People v. Lara*, 2012 IL 112370, ¶ 51 (holding that "the *corpus delicti* rule requires only that the corroborating evidence correspond with the circumstances recited in the confession and tend to connect the defendant with the crime"); see also *People v. Herring*, 324 Ill. App. 3d 458, 464 (2001) (noting that "a lack of detail in a witness's testimony only affects the weight of the evidence"). Moreover, the trial court was in a superior position to evaluate M.A.'s testimony and demeanor (*People v. Montgomery*, 192 Ill. 2d 642, 663 (2000)), and as the trier of fact, it was the court's role to resolve any evidentiary conflicts or contradictions (*Lara*, 2012 IL 112370, ¶ 46).

¶ 52    "When considering the sufficiency of the evidence, it is not the function of a reviewing court to retry the defendant." *People v. Maggette*, 195 Ill. 2d 336, 353 (2001). As previously stated, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the State, "any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime." *Brown*, 2013 IL 114196, ¶ 48. Here, viewed in the light most favorable to the State, the evidence presented for the trial court's consideration supported its finding that the defendant placed his penis on M.A.'s anus for the purpose of sexual gratification or arousal,

19

and we accordingly affirm the defendant's conviction for predatory criminal sexual assault of a child.

¶ 53                                    Motion to Suppress

¶ 54     The defendant's second argument on appeal is that the trial court erred in denying his motion to suppress statements. The defendant maintains that he was interviewed while in custody for *Miranda* purposes and that the trial court erred in concluding otherwise. The parties seemingly agree that because the trial court's ruling on the defendant's motion to suppress did not require the court to resolve factual disputes or make credibility determinations, the standard of review applicable to the court's determination that the defendant was not in custody for *Miranda* purposes is *de novo*. See *People v. Bunch*, 207 Ill. 2d 7, 13 (2003); *People v. Gott*, 346 Ill. App. 3d 236, 241 (2004).

¶ 55     Pursuant to the United States Supreme Court's decision in *Miranda v. Arizona*, 384 U.S. 436 (1966), prior to the commencement of a "custodial interrogation," the person being questioned must be advised that he has the right to remain silent, that any statements he makes may be used as evidence against him, and that he has the right to have an attorney present during the questioning. *Id*. at 444. A "custodial interrogation" is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id*.

¶ 56     Incriminating statements obtained in violation of *Miranda* are generally inadmissible at trial. See *Harris v. New York*, 401 U.S. 222, 223-26 (1971); *People v. Melock*, 149 Ill. 2d 423, 439 (1992). *Miranda* is only applicable, however, "if and only if the person being questioned is in custody." *People v. Jordan*, 2011 IL App (4th) 100629, ¶ 17; see also *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) ("*Miranda* warnings are required only where there has been such a

20

restriction on a person's freedom as to render him 'in custody.' "). When determining whether a defendant was "in custody" for *Miranda* purposes, a court must first examine the circumstances surrounding the interrogation and then ask if, under those circumstances, would a reasonable and innocent person have felt that he or she was not at liberty to terminate the interrogation and leave. *People v. Braggs*, 209 Ill. 2d 492, 506 (2003).

¶ 57 When examining the circumstances of the interrogation, the following factors are relevant: (1) the location, length, time, mood, and mode of the questioning; (2) the number of law enforcement officers present during the interrogation; (3) the presence or absence of family and friends; (4) any indicia of a formal arrest procedure, such as the show of weapons or force, physical restraint, booking or fingerprinting; (5) the manner by which the individual arrived at the place of questioning; and (6) the age, intelligence, and mental makeup of the accused. *People v. Slater*, 228 Ill. 2d 137, 150 (2008). An officer's views or beliefs as to the individual's guilt are also relevant, "but only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave." *Stansbury v. California*, 511 U.S. 318, 325 (1994).

¶ 58 After considering the factors relevant to the circumstances of the interrogation, a court must "make an objective determination as to whether, under the facts presented, 'a reasonable person, innocent of any crime' would have believed that he or she could terminate the encounter and was free to leave." *Slater*, 228 Ill. 2d at 150 (quoting *Braggs*, 209 Ill. 2d at 506, and *People v. Fair*, 159 Ill. 2d 51, 66 (1994)). "Although the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S.

21

1121, 1125 (1983) (quoting *Mathiason*, 429 U.S. at 495). A defendant's subjective beliefs that he was not free to leave are irrelevant. *People v. Enis*, 163 Ill. 2d 367, 394 (1994).

¶ 59 Here, an examination of the relevant factors supports the trial court's conclusion that the defendant's interview did not occur while he was in custody for purposes of *Miranda*. The interview occurred at the sheriff's department without the presence of any of the defendant's family or friends, but only after the defendant declined the offer to be interviewed at his home, where his mother was present. Pritchard and McCabe were the only law enforcement officers in the interrogation room, and Vick sat silently away from the table and did not participate. The interview commenced shortly after 10 a.m., lasted approximately 80 minutes, and was generally a continuous conversation that ultimately focused on what had occurred in the shower. Other than frankly advising the defendant that they believed that he was withholding information, the officers were polite and respectful. The officers repeatedly encouraged the defendant to tell the truth, but their approach was nonaggressive, and they never spoke sternly. The defendant was the only participant who at times became animated and raised his voice.

¶ 60 The defendant was 27 years old at the time of the interview, and he presented as articulate and intelligent. The defendant transported himself to and from the sheriff's department, and as he acknowledged at the beginning of the interview, he agreed to be questioned because he wanted to "get [the matter] straightened up." It also became apparent during the interview that the defendant was interested in knowing what M.A. had disclosed.

¶ 61 At no time were there any indicia of a formal arrest, and the defendant was repeatedly reminded that he was not under arrest. The defendant had an unobstructed path out of the interview room, and no one was sitting directly in front of the door as the defendant seemingly

22

suggests on appeal. The defendant emphasizes that he was positioned in the back corner of the room, but the chair nearest the corner is where he opted to sit.

¶ 62 The defendant was repeatedly assured that no matter what he said, he would be going home at the conclusion of the interview unless he confessed to having committed a murder. The defendant never asked to leave or take a break, and he was never told that he could not leave. When the interview reached an impasse and the defendant asked, "What's the next step?," McCabe reminded him that he had been free to leave at any time. The defendant indicated that he was aware that he could leave at any time and then continued to converse with the detectives and gave his third account of what had occurred in the shower. Shortly after the conversation turned to Z.M., the defendant indicated that he wanted to speak with an attorney, the interview ended, and the defendant left.

¶ 63 Under the circumstances, the facts support the trial court's determination that the defendant's interrogation did not occur while he was in custody for *Miranda* purposes. A reasonable and innocent person in the defendant's situation would have felt free to terminate the interview and leave at any time, and nothing objectively impaired the defendant's ability to do so. See *Enis*, 163 Ill. 2d at 393-94; *Fair*, 159 Ill. 2d at 66-68; *Melock*, 149 Ill. 2d at 440-43. We accordingly reject the defendant's contention that the court erred in denying his motion to suppress statements.

¶ 64 We also reject the defendant's suggestion that he had been led to believe that he could not leave until the officers informed him that the interview was over. The defendant notes that although he was assured that he could leave when the interview was over, it was only towards the end of the interview that he was specifically advised that he had been free to leave at any time. The defendant thus suggests that the officers had indicated that they would determine when

23

the interview was over and that only towards the end of the interview was he aware that he had been free to leave at any time. We disagree.

¶ 65    In context, at all times, the defendant knew that he was not under arrest and could leave at any time. Towards the end of the interview, when the defendant asked, "What's the next step?," McCabe merely reminded him of that fact. As noted, however, at no time did the defendant ever ask to leave, and contrary to the defendant's intimations on appeal, the officers never suggested that they would dictate when the interview was over or when he was free to go. *Cf. People v. Gorman*, 207 Ill. App. 3d 461, 465 (1991) (finding that the defendant was in custody for *Miranda* purposes where after being transported to the police department in a police car, he was advised that he "was free to go after the interview was over, but not until it was over" and was then denied permission to leave the interview room so that he could speak with his friends). Moreover, as noted, even after he was reminded that he had been free to leave at any time, the defendant continued to converse with the detectives and gave his third account of what had occurred in the shower.

¶ 66                                    Prosecutorial Misconduct

¶ 67    Alleging prosecutorial misconduct, the defendant's final argument on appeal is that he was denied a fair trial because the State improperly asked M.A. leading and suggestive questions that rendered the boy's testimony unreliable. Acknowledging that he raises this claim for the first time on appeal, the defendant argues that we should address it under the plain-error doctrine.

¶ 68    "The plain-error doctrine allows errors not previously challenged to be considered on appeal if either: (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant; or (2) the error was so fundamental and of such magnitude that it affected the fairness of the trial and challenged the integrity of the judicial

24

process, regardless of the closeness of the evidence." *People v. Wilmington*, 2013 IL 112938, ¶ 31. "Under both prongs of the plain-error doctrine, the burden of persuasion remains with [the] defendant" (*People v. Walker*, 232 Ill. 2d 113, 124 (2009)), and under either prong, "[a]bsent reversible error, there can be no plain error" (*People v. McDonald*, 2016 IL 118882, ¶ 48). As a result, the initial step in conducting a plain-error analysis is to determine whether error occurred at all. *Id*. Moreover, where a defendant was found guilty at a bench trial, it is presumed that the trial court considered only admissible and reliable evidence. *People v. Dugan*, 237 Ill. App. 3d 688, 698 (1992).

¶ 69    As previously noted, when the State asked M.A. if he could tell the judge about some of the "bad things" the defendant had done, M.A. indicated that the defendant had "[t]ouched one part" with "the thing." When M.A. was asked to elaborate, he was reluctant to do so. The State then encouraged the boy to tell the judge the truth and sought clarification as to what the "part" and the "thing" were. After further questioning, M.A. whispered "secret" information to the judge indicating, among other things, that "the thing" was used to defecate. When specifically asked what the defendant had done, M.A. replied, "You know, like this, like this." After M.A. indicated that the defendant had touched M.A.'s "thing" with a suppository, the State asked M.A. what part of the defendant's body the defendant had used to touch M.A.'s "thing." In response, M.A. asked, "On my butt?," and then stated, "Let me think about it." The State then asked M.A., "What makes you a boy?," and in response, M.A. whispered "worm" to the judge. When the prosecutor specifically asked whether the defendant had used his "worm" to touch M.A.'s "butt," however, the boy apparently became upset, gestured, shook his head, and stated, "Don't say that." Despite these apparent inconsistencies, during closing arguments, the parties agreed that

25

M.A. had indicated that the defendant's "worm" had touched M.A.'s "butt." When cross-examined, M.A. indicated that the touching had occurred in the defendant's shower.

¶ 70    On appeal, the defendant argues that the State improperly directed M.A.'s testimony through its leading questions that followed M.A.'s initial statement regarding what had occurred in the shower. In response, the State suggests that the defendant is unable to establish error because he is unable to establish that had he objected to the leading questions, the trial court would have abused its discretion had it not sustained his objections. We agree with the State.

¶ 71    "Allowing leading questions, when examining children of tender years, is clearly within the discretion of the trial court." *People v. Ridgeway*, 194 Ill. App. 3d 881, 885 (1990). Requiring a child victim of sexual abuse to testify in open court is a traumatic experience for the victim that often necessitates the use of leading questions. *Id*.; see also *People v. Calusinski*, 314 Ill. App. 3d 955, 959 (2000). "A reviewing court will not reverse a conviction in which the trial court permitted the use of leading questions unless it appears both that the court abused its discretion and that such abuse resulted in substantial injury to the defendant." *People v. Luigs*, 96 Ill. App. 3d 700, 707 (1981). "An abuse of discretion occurs where no reasonable person would agree with the position adopted by the trial court." *Schwartz v. Cortelloni*, 177 Ill. 2d 166, 176 (1997).

¶ 72    Here, the record does not support the defendant's claims that the State improperly suggested M.A.'s answers, fed M.A. information, and prodded him into changing his story. In context, the State's general inquiry sought clarification of M.A.'s statement that the defendant had "[t]ouched one part" with "the thing," which was not elicited through a leading question. See *Calusinski*, 314 Ill. App. 3d at 959; *Luigs*, 96 Ill. App. 3d at 707. We further note that it was reasonable for the trial court to conclude that some leading questioning was necessary given that

26

M.A. was emotionally conflicted, reluctant to testify, and required to testify in the defendant's presence. See *Ridgeway*, 194 Ill. App. 3d at 885-86; see also *People v. Zwart*, 151 Ill. 2d 37, 46 (1992) (observing that "courts have recognized that child victims of sexual abuse are often reluctant to discuss the abuse with anyone other than their mothers"); *People v. Fletcher*, 328 Ill. App. 3d 1062, 1071 (2002) ("[I]t can be presumed that forcing the victim, age nine, to testify in front of defendant, who was her uncle, would cause the victim trauma and emotional distress."). Ultimately, however, we discern no prosecutorial misconduct, and we cannot conclude that M.A.'s testimony was tainted or unreliable. *Cf. In re N.E.R.*, 159 Ill. App. 3d 320, 326 (1987) (noting that "the prosecutor's excessive use of leading questions led to little, if any, credible testimony actually being elicited from the complainant"). We lastly note that in conjunction with M.A.'s representations that the defendant sometimes touched him in ways he did not like, M.A.'s testimony that while they were in the shower together, the defendant had "[t]ouched one part" with "the thing" was arguably in and of itself sufficient to corroborate the defendant's confession without any further clarification. As previously indicated, "the *corpus delicti* rule requires only that the corroborating evidence correspond with the circumstances recited in the confession and tend to connect the defendant with the crime." *Lara*, 2012 IL 112370, ¶ 51. The corroborating evidence "need not precisely align with the details of the confession on each element of the charged offense, or indeed to any particular element of the charged offense." *Id*. In any event, we conclude that the defendant is unable to establish that the State's use of leading questions in the present case constituted error, let alone plain error. We accordingly reject the defendant's claim that he was denied a fair trial.

¶ 73                                    CONCLUSION

¶ 74    For the foregoing reasons, the defendant's conviction for predatory criminal sexual assault of a child is hereby affirmed.


¶ 75    Affirmed.